UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 11-10577-RWZ


DIANA D. MERRIAM, *et al.*

v.

ARTHUR T. DEMOULAS, *et al.*

<u>MEMORANDUM OF DECISION</u>

June 3, 2013


ZOBEL, D.J.

Plaintiffs are three shareholders of Demoulas Super Markets, Inc. ("DSM") and

participants in its profit-sharing plan ("the Plan"). The Plan is covered by the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiffs bring this

action on behalf of the Plan against two classes of defendants: the Plan's three

trustees ("the Trustee defendants"), and five of DSM's directors ("the Director

defendants"). Plaintiffs seek damages and equitable relief to recover around $46 million

that the Plan allegedly lost through defendants' actions.

On March 20, 2012, I issued an order dismissing plaintiffs' complaint and

granting leave to amend. Plaintiffs then filed an amended complaint. Defendants

responded by filing four separate motions to dismiss, which are now before me.

**I.     Background**

The Plan is a defined contribution employee pension benefit plan governed by

ERISA. As a defined contribution plan, the Plan maintains separate bookkeeping

accounts for each participant. But unlike many defined contribution plans, it does not allow individual participants to decide their own investment strategies; instead, it aggregates all of its funds into a single investment portfolio selected by the Plan's trustees. Each participant is entitled to a different percentage of the value of the entire portfolio. If the value of the portfolio increases or decreases by a certain percentage, the value of each participant's account increases or decreases by that same percentage.

The Plan is controlled by certain documents, including an official investment policy (the "Investment Policy"). That Investment Policy names both DSM's board of directors and the Plan's trustees as fiduciaries of the Plan. The directors appoint and remove the trustees; the trustees manage the Plan and invest its assets.

The Investment Policy also contains certain restrictions on how the trustees may invest the Plan's assets. For instance, the Investment Policy states that the trustees normally may not invest more than 25% of the Plan's assets in equity issued by U.S. companies, or invest more than 5% of the Plan's assets devoted to U.S. large capitalization equity in any single holding.

In November 2007, the Trustee defendants invested $12.5 million of the Plan's assets in preferred stock issued by the Federal Home Loan Mortgage Corporation ("Freddie Mac"). In May 2008, they invested $33.75 million in preferred stock issued by the Federal National Mortgage Association ("Fannie Mae"). Plaintiffs allege that both investments were irresponsible and violated the explicit rules of the Investment Policy.

Those investments almost immediately lost nearly all their value. In August

2008, the Trustee defendants reported to DSM's board that the Plan had lost about $46 million in the Freddie Mac and Fannie Mae investments. The Trustee defendants asked the DSM board to make a $46 million "restorative payment" from DSM to the Plan to cover those losses. The board approved that payment by a five-to-two vote, with the five Director defendants in the majority. DSM actually made the restorative payment in January 2009, in the amount of $46,183,772.

Plaintiffs allege that the Trustee defendants breached their fiduciary duties by making these irresponsible investments (Counts I and II). They also allege that the Director defendants violated their fiduciary duties by failing to act solely in the interest of the Plan participants and beneficiaries (Count III), by concealing the Trustees' misdeeds and failing to remedy them (Count IV), and by failing to hire legal counsel to investigate claims against the Trustees (Count V).[1] Plaintiffs furthermore insist that two of the Trustee defendants, Arthur T. Demoulas and D. Harold Sullivan, acted in contempt of two prior court orders that enjoined them from violating ERISA (Count VI). Finally, plaintiffs seek a declaratory judgment that neither the Trustee defendants nor the Director defendants are entitled to indemnification by DSM.

In response, defendants have filed four separate motions to dismiss for lack of standing and for failure to state a claim. Plaintiffs have opposed each motion, and the briefing is now complete.

## II.    Legal Standard

---

[1] Count V is brought against only four of the Director defendants: William J. Shea, J. Terence Carleton, Sumner Darman, and Charles Roazen.

If the plaintiffs lack constitutional standing, then I have no subject matter jurisdiction over their claims, because "[t]he Constitution limits the judicial power of the federal courts to actual cases and controversies." <u>Katz v. Pershing, LLC</u>, 672 F.3d 64, 71 (1st Cir. 2012).  On a motion to dismiss for lack of standing, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor. <u>Id.</u> at 71.

Likewise, on a motion to dismiss for failure to state a claim, the court accepts as true all factual allegations contained in the complaint (but not legal conclusions). <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). If the complaint fails to state a plausible claim upon which relief can be granted, it must be dismissed. <u>Id.</u>

**III.   Analysis**

Since defendants' motions to dismiss overlap substantially, I consider them together rather than proceeding sequentially through each motion.

**A.    Constitutional Standing**

I must begin with the jurisdictional issue of constitutional standing. <u>See</u> <u>United Seniors Ass'n v. Philip Morris USA</u>, 500 F.3d 19, 23 (1st Cir. 2007). As the party invoking federal jurisdiction, plaintiffs have the burden of establishing standing. <u>Steir v. Girl Scouts of the USA</u>, 383 F.3d 7, 14 (1st Cir. 2004). That requires establishing three elements: injury in fact, causation, and redressability. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992). Defendants argue that plaintiffs have failed to allege any injury in fact; the Director defendants additionally argue that plaintiffs have failed to allege causation.

4

### 1. Injury in Fact

Plaintiffs have alleged that the investments in Fannie Mae and Freddie Mac lost the Plan some $46 million. They have also alleged that because of the structure of the Plan, their individual account balances as Plan participants lost proportionate amounts. Those factual allegations are sufficient to show that each individual plaintiff suffered a concrete and particularized financial injury, meeting the injury-in-fact requirement. See Lujan, 504 U.S. at 560. The plaintiffs are not required to additionally allege the precise amount they lost.

The Director defendants argue that plaintiffs lack standing because their injury was already redressed by DSM's restorative payment. That argument misses the mark. A plaintiff does not lose standing to sue a tortfeasor just because a third party has already compensated her for the injury. See In re State Street Bank & Trust Co. ERISA Litig., 579 F. Supp. 2d 512, 517 (S.D.N.Y. 2008) (noting that an action is not necessarily mooted when a plaintiff's damages are reimbursed by a third party). That principle is reflected in the substantive law of damages by the collateral source rule, which generally states that "benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer do not diminish the damages otherwise recoverable from the wrongdoer." 22 Am. Jur. 2d Damages § 392 (West 2013). The reason for the rule is obvious: a generous third party who restores an injured plaintiff intends only to help that plaintiff, not to relieve the wrongdoer of responsibility. See id.

The Director defendants concede the merits of the collateral source rule, but argue that it should not apply in ERISA cases. That argument fails. Absent some

reason for abrogating the rule in a particular context, "[t]he general rule in the federal courts is that the collateral source rule is applied." Hartnett v. Reiss S.S. Co., 421 F.2d 1011, 1016 n.3 (2d Cir. 1970). Moreover, at least two well-reasoned opinions have recently applied the collateral source rule in the ERISA context. See Chao v. Merino, 452 F.3d 174, 184-85 (2d Cir. 2006); State Street, 579 F. Supp. 2d at 517. I find that precedent persuasive.

Finally, the Director defendants argue that even if the collateral source rule is generally applicable in ERISA cases, it should not apply here because it would provide the Plan a double recovery. But the entire point of the collateral source rule is that a double recovery for the injured plaintiff is better than a windfall for the tortfeasor. See 22 Am. Jur. 2d Damages § 392.[2]

I note in passing that the collateral source rule may not apply to payments that are made "seeking to extinguish or reduce the obligation" that a tortfeasor owes a plaintiff. Restatement (Second) of Torts § 920A cmt. a (West 2013); see id. § 885(3). The parties have not discussed whether the restorative payment was intended to extinguish any possible liability against the defendants. In any case, that question necessarily requires more factual development. I therefore do not address it further.

In summary, plaintiffs have suffered a cognizable injury in fact even if they have been made whole by a third party. Their complaint is not subject to dismissal on this

---

[2] Furthermore, there may be no double recovery if DSM can later bring an equitable subrogation claim to capture any duplicative compensation. Cf. Frost v. Porter Leasing Corp., 436 N.E.2d 387, 388-91 (Mass. 1982). See generally 73 Am. Jur. 2d Subrogation § 1. As that question is not before me, I express no opinion on whether such a claim would be successful or even feasible.

6

basis.

### 2.    Causation

The Director defendants also argue that plaintiffs have failed to allege a

sufficient causal connection between the Director defendants' conduct and any actual

injury. See Lujan, 504 U.S. at 560 (standing requires "a causal connection between the

injury and the conduct complained of"). That argument likewise fails. The allegations in

the complaint are sufficient to meet Article III's causation requirement.

To establish standing, a plaintiff must show that his injury is "fairly traceable" to

some conduct for which the defendant may be held liable. Already, LLC. v. Nike, Inc.,

133 S. Ct. 721, 726 (2013) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). But this

causation standard does not require that the defendant personally commit the act that

harms the plaintiff. For instance, a plaintiff can have standing to sue a principal for acts

committed by his agent. See Socy' of Holy Transfiguration Monastery v. Gregory, 689

F.3d 29, 57 (1st Cir. 2012) (citing Restatement (Third) of Agency § 7.04)). Likewise, a

plaintiff can have standing to sue one conspirator for harms directly caused by the

actions of a co-conspirator. See Taylor v. Am. Chem. Council, 576 F.3d 16, 34-35 (1st

Cir. 2009). In such cases, Article III is satisfied because the plaintiff's injury is fairly

traceable to acts for which the defendant may be held liable, even if the defendant did

not directly cause or commit those acts. In other words, Article III's causation

requirement does not eliminate all forms of vicarious liability.

In this case, the primary injury plaintiffs suffered is the Plan's loss of $46 million

(and the proportionate loss in each plaintiff's own account). That loss occurred because

the Trustee defendants invested in Fannie Mae and Freddie Mac. The Director

defendants were not involved in the decision to make those investments; indeed, they

did not know of those investments until after their value had begun to decline. However,

the plaintiffs allege that after the loss occurred, the Director defendants (1) failed to

remove any of the Trustee defendants; (2) failed to sue the Trustee defendants for the

Plan's losses; (3) "concealed" the Trustee defendants' investments by authorizing the

restorative payment; and (4) refused to retain counsel to investigate the Trustees'

actions.

    Plaintiffs assert that these acts subject the Director defendants to cofiduciary

liability under 29 U. S. C. § 1105(a), which states (as relevant here):

> [A] fiduciary . . . shall be liable for a breach of fiduciary responsibility of
> another fiduciary . . . :
>
>> (1) if he participates knowingly in, or knowingly undertakes to conceal,
>> an act or omission of such other fiduciary, knowing such act or
>> omission is a breach; . . .
>> (3) if he has knowledge of a breach by such other fiduciary, unless he
>> makes reasonable efforts under the circumstances to remedy the
>> breach.

29 U.S.C. § 1105(a). Like the agency and conspiracy examples discussed above, this

provision can be read as creating a form of vicarious liability by making one fiduciary

liable for the actions of another. Article III does not forbid this vicarious liability any

more than it forbids suing a principal for an agent's conduct or a conspirator for the

actions of a co-conspirator. As such, plaintiffs can maintain Article III standing here

without showing that the Director defendants directly harmed them. Their constitutional

standing rests on the allegation that they were directly harmed by the Trustee

defendants' alleged breach, for which (they allege) the Director defendants are

vicariously liable. Whether the Director defendants are in fact vicariously liable for that

breach is a merits question that should not be conflated with the standing issue.

See Braden v. Wal-Mart Stores, 588 F.3d 585, 592 (8th Cir. 2009) (standing and merits

are two distinct inquiries); City of Hope Nat'l Med. Ctr. v. Healthplus, Inc., 156 F.3d 223

(1st Cir. 1998) (same).

### B.    Statutory Standing

Although plaintiffs have properly demonstrated constitutional standing, they must

also show statutory standing in order to maintain this suit. Katz, 672 F.3d at 75.

Statutory standing asks "whether the statute gives that plaintiff authority to sue," a

question that "goes to the merits of the claim." Id. In this case, two separate statutory

standing questions are at issue. The first is whether the statute authorizes plaintiffs to

sue the Director defendants for harm caused by the Trustee defendants. The second is

whether the statute authorizes plaintiffs to recover all the damages the Plan suffered, or

only the damages their individual accounts suffered. I address each in turn.

### 1.    Claims Against the Director Defendants

Plaintiffs' statutory cause of action for damages comes from 29 U.S.C.

§ 1132(a)(2), which authorizes a plan participant to seek relief under 29 U.S.C. § 1109.

In turn, § 1109(a) states that "any person who is a fiduciary with respect to a plan who

breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by

this subchapter shall be personally liable to make good to such plan any losses to the

9

plan resulting from each such breach." 29 U.S.C. § 1109(a). Given the statutory phrase "resulting from," courts have repeatedly held that a fiduciary "can only be held liable upon a finding that the breach actually caused a loss to the plan." Plasterers' Local Union No. 96 Pension Plan v. Pepper, 663 F.3d 210, 217 (4th Cir. 2011).

As described above, however, § 1105(a) states that one fiduciary "shall be liable for a breach of fiduciary responsibility of another fiduciary" if he "participates knowingly in," "knowingly undertakes to conceal," or knowingly fails to "make[] reasonable efforts under the circumstances to remedy" his cofiduciary's breach. 29 U.S.C. § 1105(a). The question here is how § 1109(a) and § 1105(a) interact.

One possibility is that § 1105(a) creates vicarious liability, making one fiduciary liable for any harm caused by another fiduciary's breach if he participates in, conceals, or fails to remedy that breach. On that reading, the causation requirement of § 1109(a)'s "resulting from" language is satisfied because the injury results from one fiduciary's breach; it need not also result from the defendant's participation in, concealment of, or failure to remedy that breach. The other possibility is that § 1109(a)'s causation requirement overlays the § 1105(a) inquiry as well, so that a fiduciary is only liable under § 1105(a) if the plan's losses result from his own participation in, concealment of, or failure to remedy the underlying breach.

It is easy to see how these two interpretations lead to different results. Imagine, for instance, that Fiduciary A breaches his duties and causes a loss to his plan. Imagine further that Fiduciary B learns of Fiduciary A's breach and "knowingly undertakes to conceal" it, 29 U.S.C. § 1105(a)(1), but his attempt at concealment is

10

totally ineffective and therefore harmless. Under the first interpretation above, Fiduciary B's attempt at concealment makes him liable for the entire loss resulting from Fiduciary A's breach; under the second interpretation, Fiduciary B is not liable at all, because no additional harm resulted from his ineffective attempt at concealment.

The Second Circuit adopted the latter interpretation in <u>Silverman v. Mut. Benefit Life Ins. Co.</u>, 138 F.3d 98, 105 (2d Cir. 1998). In that case, two of the plan's trustees embezzled $130,000 from the plan's assets. The plan's administrator became aware that funds were missing, but did nothing substantive about the problem for several months. Meanwhile, the trustees spent the entire sum. <u>Silverman</u>, 138 F.3d at 100-02.

After the embezzlement came to light, an independent fiduciary was appointed for the plan, who sued the plan administrator under § 1109(a) and § 1105(a)(3)  for failing to make reasonable efforts to remedy the trustees' embezzlement. The Second Circuit affirmed the district court's grant of summary judgment in favor of the plan administrator. It held that the plaintiff had failed to show the causation required by § 1109(a), because he had failed to prove that the plan administrator could actually have recovered some money by making reasonable efforts. <u>Id.</u> at 104-05. If no reasonable efforts could have recovered money for the plan, the Second Circuit concluded, then the administrator did not harm the plan by failing to try.

On that interpretation, a suit under § 1132(a)(2) and § 1109(a) cannot assert true vicarious liability under § 1105(a). Under <u>Silverman</u>, a fiduciary is not liable in such a suit for the full extent of his cofiduciary's misdeeds; instead, he is only liable for harm actually caused by his own actions in participating in the breach, concealing it, failing to

remedy it, etc.

Silverman apparently remains good law in the Second Circuit, and it has been followed by other courts as well. See, e.g., Stanford v. Foamex L.P., 822 F. Supp. 2d 455, 488 (E.D. Pa. 2011); Nagy v. DeWese, 771 F. Supp. 2d 502, 520 (E.D. Pa. 2011); see also Willett v. Blue Cross & Blue Shield of Ala., 953 F.2d 1335, 1343 (11th Cir. 1992) (fiduciary liable only for injuries suffered as a result of its failure to cure cofiduciary's breach). I likewise adopt its interpretation of these statutory sections. Plaintiffs can only seek recovery under § 1132(a)(2), § 1109(a), and § 1105(a) for harm resulting from the Director defendants' own actions.[3]

As noted above, plaintiffs allege that the Director defendants caused them harm in four ways: (1) by failing to remove the Trustee defendants as trustees;  (2) by failing to sue the Trustee defendants; (3) by authorizing the restorative payment and thus "concealing" the Plan's losses; and (4) by refusing to retain independent counsel to investigate the Trustees' conduct. But their allegations are not sufficient to show any cognizable harm resulting from these actions.

First, the plaintiffs do not allege that any harm resulted from the Director defendants' failure to remove the Trustee defendants after the loss occurred.[4] But plaintiffs do not allege any further harm done after the $46 million loss that removing the Trustee defendants could have avoided.

---

[3] Naturally, the same is true to the extent plaintiffs seek damages from the Director defendants via § 1132(a)(2) and § 1109(a) for any alleged breach of the Director defendants' duties under § 1104.

[4] Plaintiffs do not allege that the Director defendants should have removed the Trustee defendants before the loss occurred. There was apparently no reason to remove the Trustee defendants before that time.

Second, the alleged harm from the Director defendants' failure to sue the Trustee defendants is too speculative to sustain a claim. See Astro-Med, Inc. v. Nihon Kohden Am., 591 F.3d 1, 19 (1st Cir. 2009) (damages may not be recovered if purely speculative). Litigation is inherently risky, and even claims that are strong on the merits may fail for other reasons. Moreover, plaintiffs have made no factual allegation showing that the Director defendants would actually have been able to recover any amount from the Trustee defendants even if they successfully obtained a judgment. Cf. Silverman, 138 F.3d at 105 (plaintiff claiming failure to sue must show assets were available that the defendant could have recovered). Given these contingencies, plaintiffs have failed to state a plausible claim that the Director defendants actually caused harm to the Plan by failing to sue the Trustee defendants. See Iqbal, 556 U.S. at 678.

Third, plaintiffs do not show the Director defendants caused the Plan any harm by their alleged "concealment" of the Trustee defendants' misdeeds (i.e., by the restorative payment). That $46 million restorative payment presumably did the Plan a great deal of good, not harm.[5] Moreover, plaintiffs do not allege any actual harm stemming from the concealment; for instance, they do not allege that any investment opportunity or statute of limitations expired because the Director defendants were keeping the loss "concealed." Finally, any alleged concealment was obviously ineffective, because one of the named plaintiffs was present at the board meetings

---

[5] The restorative payment also makes plaintiffs' claims against the Director defendants under § 1105(a)(3) sound rather hollow. Section 1105(a)(3) imposes liability "unless [the fiduciary] makes reasonable efforts under the circumstances" to remedy a cofiduciary's breach. It is hard to imagine how the Director defendants failed to make reasonable efforts here, given that they actually did remedy the alleged cofiduciary breach by authorizing the restorative payment. Given that plaintiffs have not alleged any cognizable harm from the Directors' actions, however, I need not determine at this juncture whether the Directors' actions described in the complaint qualify as "reasonable efforts" as a matter of law.

where the Director defendants learned of the loss and voted on the restorative payment. In sum, plaintiffs have not plausibly alleged that the Director defendants caused the Plan any harm by "concealing" the Trustees' misdeeds.[6]

Fourth, the plaintiffs do not explain how the Director defendants' failure to hire independent counsel to investigate the Trustees' actions caused harm to the Plan. To the extent plaintiffs argue that investigation was required so that the Director defendants could pursue a claim against the Trustee defendants, the alleged harm is too speculative to state a claim for the reasons described above.[7]

Because plaintiffs' allegations do not show that the Director defendants actually caused the Plan any harm by their acts and omissions, they cannot recover under § 1132(a)(2), § 1109(a), and § 1105(a). The same logic applies to plaintiffs' claim for surcharge as an equitable remedy under § 1132(a)(3). Like § 1109(a), surcharge provides compensation only for losses "resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1880 (2011); see also id. at 1881-82 (plan participant must show actual harm to obtain relief by surcharge).[8] As discussed above, plaintiffs have not alleged any plausible losses

---

[6] Moreover, as the repeated scare quotes above indicate, the allegation that the restorative payment served to conceal the Plan's losses is one that stretches the furthest bounds of plausibility.

[7] To the extent plaintiffs also charge the Director defendants with either direct liability under § 1104 or cofiduciary liability under § 1105(a) for failing to notify plan participants of the losses, failing to remove Goldman Sachs as the plan's investment manager, or generally "failing to discharge their duties with respect to the Plan solely in the interest of the Plan participants and beneficiaries," Am. Compl. ¶ 133, I likewise find the plaintiffs have failed to allege any non-speculative injury to the Plan resulting from those failures.

[8] Of course, plaintiffs are not required to show actual harm in order to seek prospective injunctive relief. See Horvath v. Keystone Health Plan East, Inc., 333 F.3d 450, 456 (3d Cir. 2003). But plaintiffs do not seek any prospective injunctive relief against the Director defendants.

14

resulting from the Director defendants' actions; they also have not alleged the Director defendants were unjustly enriched. Therefore, they have not stated a claim for surcharge against those defendants.[9]

Plaintiffs' claims against the Director defendants are therefore dismissed.[10]

## 2.    Claims for All Damages Suffered by the Plan

In their complaint, plaintiffs seek damages on behalf of the Plan for the full $46 million loss that the Plan suffered. The Trustee defendants respond that plaintiffs can only sue for the losses to their individual accounts within the Plan, not the total loss suffered by the entire Plan.

I begin with the statute. As discussed above, plaintiffs bring their damages claim under 29 U.S.C. § 1132(a)(2), which authorizes a civil action "by the Secretary [of Labor], or by a participant, beneficiary, or fiduciary for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). Section 1109 then provides that "a fiduciary with respect to a plan . . . shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." Id. § 1109(a).

The most natural reading of this language is that any of the individuals named in

---

[9] Because the claim for surcharge fails in any event, there is no need to decide whether that remedy is barred by the availability of other relief. See Varity Corp. v. Howe, 516 U.S. 489, 515 (1996) (relief under § 1132(a)(3) normally not available where Congress has elsewhere provided adequate relief).

[10] Given this outcome, I need not and do not consider defendant Edward H. Pendergast's further argument that the Director defendants were not acting in a fiduciary capacity in the actions complained of.

§ 1132(a)(2) have statutory standing to seek relief for the entire plan under § 1109(a).

That conclusion flows from the wording of both sections. First, § 1132(a)(2) lists plan

fiduciaries and the Secretary of Labor immediately alongside plan participants and

beneficiaries as parties who can seek relief. Of course, the Secretary and plan

fiduciaries will not suffer individual loss from harm to the plan; they are presumably

entitled to recover for the plan as a whole. If those parties are allowed to seek recovery

for the whole plan, it is hard to see why participants and beneficiaries should not be.

The Supreme Court has adopted that same logic, noting in dicta that by including the

Secretary in § 1132(a)(2), Congress indicated its "intent that actions for breach of

fiduciary duty be brought in a representative capacity on behalf of the plan as a whole."

Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 n.9 (1985).

Second, § 1109(a)'s emphatic focus on the plan as a whole reinforces the same

conclusion. The text of § 1109(a) specifically makes a fiduciary liable "to make good to

such plan any losses to the plan," not just losses to the individual plaintiff bringing suit.

See LaRue v. DeWolff, Boberg & Assocs., 552 U.S. 248, 261-62 (2008) (Thomas, J.,

concurring in the judgment) ("The plain text of [§ 1109(a)], which uses the term 'plan'

five times, leaves no doubt that [§ 1132(a)(2)] authorizes recovery only for the plan. . . .

On their face, [these statutes] permit recovery of all plan losses caused by a fiduciary

breach."). Thus, the plain language of the statute authorizes a plan participant to seek

recovery for all losses suffered by the plan.

The Trustee defendants resist this conclusion, arguing that the statutory text

only guarantees that the Plan will take title to any recovery. The statute certainly

requires at least that much; it is well established that an ERISA plaintiff recovers damages for the plan, not for herself individually. See Russell, 473 U.S. at 140; LaRue, 552 U.S. at 256. But the statute suggests more than just that. The language of § 1109(a) strongly indicates not only that the plan will take title to any recovery, but that plan participants have statutory standing to sue for any losses the plan suffers.

Next, the Trustee defendants advance a pragmatic distinction. Looking to previous caselaw, they argue that plan participants may be entitled to sue on behalf of the whole plan for defined benefit plans, but are not entitled to do so for the defined contribution plan at issue here. In a defined benefit plan, participants are entitled to certain guaranteed benefits funded by the plan's assets as a whole; the benefits owed remain the same regardless of how the plan's investments perform. In a defined contribution plan, by contrast, each participant has a separate benefits account whose value may vary with the market. See LaRue, 552 U.S. at 250 n.1; Bendaoud v. Hodgson, 578 F. Supp. 2d 257, 264 (D. Mass. 2008). In Bendaoud, another case from this district, the court accepted an argument similar to the one advanced here; it held that participants in a defined contribution plan could only seek recovery to the extent that their individual plan accounts suffered losses. 578 F. Supp. at 263-67. The Bendaoud court noted that in a defined benefit plan, any harm to the plan's assets necessarily harmed all participants, by making it more likely the plan would go bankrupt and fail to pay the promised benefits. In that situation, the court explained, "allowing a plaintiff to recover the entire amount by which the asset was impaired . . . ensures that plaintiffs can effectively protect the benefit plan without the need for a class action." Id.

17

at 264. However, it held that the same logic did not apply in a defined contribution

setting, where each individual participant is not harmed by the loss to other

participants' accounts. Where multiple participants in a defined contribution plan are

harmed by the same breach, the court held, "the proper approach is joinder of the

affected participants or the certification of a class." Id. at 266. It considered those

procedures necessary to protect the interests of other plan participants who the plaintiff

might not otherwise effectively represent. Id. at 257.

I respectfully disagree with the interpretation in Bendaoud. The distinction

between defined benefit plans and defined contribution plans appears nowhere in the

relevant sections of ERISA, and I am reluctant to add that substantial gloss to this

"comprehensive and reticulated statute," Nachman Corp. v. Pension Benefit Guar.

Corp., 446 U.S. 359, 361 (1980). Nor am I persuaded by the prudential concerns the

Bendaoud court raised, at least not as they apply in this case. Here, each participant in

the Plan has suffered a proportionate loss, and any recovery to the Plan will

presumably be distributed proportionately among the individual accounts of all Plan

participants. The fear that one plaintiff will not adequately represent the whole Plan's

interests is thus no greater here than in the defined benefit context. Cf. Bendaoud, 578

F. Supp. 2d at 266-67. If a class action is not required in the defined benefit context, I

do not see why it should be required here. Cf. id. at 264.

Striving for textual support, the Trustee defendants focus on the term

"appropriate relief" in § 1132(a)(2), arguing that different relief is appropriate depending

on who the plaintiff is and what type of plan is at issue. For instance, they argue it

18

might be "appropriate relief" for the Secretary to seek plan-wide relief, or for a participant in a defined benefit plan to seek plan-wide relief, but not for a participant in a defined contribution plan to seek plan-wide relief. This argument is not wholly implausible; but I am again reluctant to read such hidden distinctions into the language of ERISA. Moreover, on the facts alleged in the complaint, it appears that recovery for all the Plan's losses is indeed "appropriate relief" in this case. Because each participant's individual account is worth a set percentage of the Plan's total value, plaintiffs will only be made whole if the entire Plan is made whole. Here as in a defined benefit plan, plaintiffs' own recovery is dependent on plan-wide recovery.

For these reasons, I hold that § 1132(a)(2) and § 1109(a) authorize plaintiffs to seek full recovery on behalf of the Plan for its $46 million loss.

### C.    Contempt Claim

Finally, Trustee defendants Arthur T. Demoulas and D. Harold Sullivan move to dismiss Count VI, which charges them with civil contempt for violating court orders issued against them in previous civil cases. Those court orders simply enjoined them from violating relevant sections of ERISA. As both parties agree, such "obey-the-law" injunctions may or may not be enforceable depending on the specific circumstances. See Converse, Inc. v. Reebok Int'l, 328 F. Supp. 2d 166, 168-69 (D. Mass. 2004). At this point, the factual record is not sufficiently clear to determine whether the injunction was specific enough, under the circumstances, to place the persons enjoined on notice that their conduct violated that order. See Fed. R. Civ. P. 65(d)(1)(C) (injunction must describe in reasonable detail the acts restrained or required). Therefore, dismissal of

Count VI is denied at this time.

       **D.**    **Indemnification**

       The parties agree that Count VII, in which plaintiffs seek a declaratory judgment that defendants are not entitled to indemnification, should only proceed if other claims are also proceeding. Since all other claims have been dismissed as to the Director defendants, Count VII is also dismissed as to the Director defendants. However, Count VII may proceed as to the Trustee defendants.

**IV.**    **Conclusion**

       Defendants' motions to dismiss (Docket ## 68, 70, 71, and 73) are ALLOWED IN PART and DENIED IN PART. All counts against the Director defendants are DISMISSED for failure to state a claim.  All counts against the Trustee defendants remain.

     _____June 3, 2013_____                _____/s/Rya W. Zobel_____

               DATE                                    RYA W. ZOBEL
                                           UNITED STATES DISTRICT JUDGE